THE STATE OF OHIO, APPELLEE, *v.* SCOTT, APPELLANT.

[Cite as *State v. Scott,* 101 Ohio St.3d 31, 2004-Ohio-10.]

(No. 2000–1001—Submitted July 8, 2003—Decided January 14, 2004.)

O'DONNELL, J.

{¶ 1} Michael Dean Scott appeals from a judgment of the Stark County Court of Common Pleas, entered pursuant to jury verdicts finding him guilty of the murder of Dallas Green, with a firearm specification; and the aggravated robbery, kidnapping, and aggravated murder of Ryan Stoffer, with firearm specifications and three death-penalty specifications; and from the imposition of the death penalty in connection with the aggravated-murder conviction. Because none of Scott's ten propositions of law are well taken, we overrule them and affirm his convictions; further, after independently weighing the aggravating circumstances against the mitigating factors and comparing his sentence to those imposed in similar cases, as required by R.C. 2929.05(A), we also affirm the imposition of the death penalty.

{¶ 2} The circumstances that gave rise to these convictions began during the early morning hours of August 24, 1999, as Scott, then 22 years of age, and his friends, Michael Wilson and Ryan Allen, walked from the Canton Centre Mall toward the apartment of Amber Harsh, one of Scott's girlfriends. Dallas Green, who did not know Scott or his friends, drove past them, and Scott shouted, "Hey," prompting Green to stop his vehicle. Green exited his vehicle and waited for the three to join him.

{¶ 3} The four men began talking. Green told them "about the party he was going to at his girl friend's, stuff like that." As their conversation continued, Green started talking as if the others "were his girlfriends." He pointed at Scott, Allen, and Wilson, telling each, "[Y]ou are my bitch."

{¶ 4} After talking for about a half hour, Green returned to his vehicle and got inside. Scott approached Green and asked for a ride. Green responded that "he couldn't do it." Scott then asked Green for the time. When Green turned his head to look at the clock on the dashboard, Scott pointed a .22 caliber handgun at him, said, "[N]ow who the bitch mother fucker," and then shot Green twice in the back and once in the left cheek.

{¶ 5} Green drove off, but after traveling a few blocks, collided with a parked vehicle near the Old–Timer's Club on Tenth and Ross Streets. He later died at Mercy Medical Center from the gunshot wounds inflicted by Scott.

{¶ 6} After shooting Green, Scott fled the scene with Wilson and Allen and went to Harsh's apartment. There, Scott emptied the shell casings from the handgun and threatened Wilson and Allen that he would shoot them if they told

anybody about the shooting. Allen and Wilson later explained that they had failed to report the crime because they feared for their safety.

{¶ 7} Thereafter, Scott asked his friend, Todd Jewell, whether he had ever heard of Dallas Green, and Jewell said that he had not. Jewell asked Scott whether Green had been killed, and Scott said, "Yeah." On a later occasion, as Jewell and Scott drove near the Old–Timer's Club, Scott pointed and stated, "[T]his is where I killed Dallas at."

{¶ 8} In early September, Scott mentioned to Jewell that he wanted to test-drive a vehicle and kill the owner. Despite Jewell's protest that Scott did not have to kill anyone in order to steal a car, Scott reiterated his idea during a later conversation with Jewell and another friend, Dustin Hennings. Hennings also told Scott that he could steal the car without killing anyone.

{¶ 9} After these conversations, on Friday, September 10, 1999, Scott, one of his girlfriends, Kerry Vadasz, and Jewell saw a Ford Probe with a "for sale" sign in the window parked in the front yard of Ryan Stoffer's grandmother on Dryden Avenue in Canton, Ohio. Scott wrote down the telephone number and told Jewell that he wanted to call the owner, take the car for a test drive, have Vadasz drive, and shoot the owner from the back seat. Scott then called the number and arranged to test-drive the vehicle the next day. As Jewell drove Scott to test-drive the vehicle, Scott again mentioned that he wanted to follow through with his plan to kill the owner and steal the car. Scott asked Jewell to drive the Probe, but Jewell declined, stating that he did not know how to operate a standard transmission vehicle.

{¶ 10} Nevertheless, Scott and Jewell met Stoffer, who took them for a test drive that afternoon. Scott then told Stoffer that he wanted his girlfriend to look at the car and that he would call him on Sunday to make arrangements.

{¶ 11} The following Sunday afternoon, Vadasz called Stoffer from the home of Scott's brother, Anthony Scott, and arranged to meet Stoffer at Stoffer's grand-mother's house in Canton, Ohio. Jewell then drove Scott and Vadasz to Canton but did not accompany them on the test drive. Brenda Stoffer, Ryan Stoffer's mother, watched her son, Scott, and Vadasz get into the car, thinking that they would return after a short test drive.

{¶ 12} Vadasz drove the Probe, Stoffer sat in the front passenger seat, and Scott rode in the back seat. She drove the car for the next hour and a half. As time passed, Stoffer provided directions on how to return to his grandmother's house, but ostensibly because Vadasz had little experience with driving a stan-dard transmission, Scott told her to keep driving until she got used to it.

{¶ 13} Scott eventually removed a .22 caliber handgun from his pants pocket and placed it on the seat. According to his confession to the police, "[a]fter about

ten minutes, [he] just lifted [the gun] up and sat it back behind the head rest of [Stoffer's] chair. And just left it sittin' there for like two more minutes." Scott then fired six shots into the back of Stoffer's head.

{¶ 14} Afterward, Scott and Vadasz dumped Stoffer's body in a secluded, wooded area and then drove to a friend's home to clean up. They placed plastic trash bags on the front passenger seat so that Vadasz would not get blood on her, and then Scott drove to her home in Akron, where they parked Stoffer's car in her garage. Later that evening, Scott telephoned Jewell and reported killing Stoffer and dumping his body in the woods. According to Jewell, Scott said that "he shot him once, and afterwards he kind of freaked out and he put the other five bullets in the gun into his head." Scott then asked Jewell to "help him bury the body," but Jewell refused.

{¶ 15} Later that evening, Scott and Vadasz returned to Canton in Stoffer's Probe. While there, Scott talked about the shooting with Jewell and Hennings. Hennings remembered Scott's saying that "he just put the gun behind the boy's head and pulled the trigger once, and he said then he emptied the whole clip in the same hole in the back of his head through the padding of the seat." Scott also mentioned that he had left the gun at Vadasz's home in Akron. Scott and Vadasz eventually returned to Akron, and on Monday morning, Scott drove the Probe to work.

{¶ 16} When Stoffer did not return from the test drive Sunday evening, his mother called the police. Her husband had informed her that the people who took the test drive had called and said that "they don't want the car; they don't have the money." The Stoffer family heard nothing further about Stoffer until the following Wednesday when the sheriff's department informed them that his body had been found.

{¶ 17} On Monday, the day after Stoffer's murder, Jewell telephoned Scott and advised him that he had seen a news report about Stoffer's disappearance on television. In response, Scott stated, "I am going to get rid of this thing, I'll call you back." Scott and Vadasz then cut the bloody seatbelt out of the Probe and threw it into a sewer across the street from Vadasz's apartment. They also put on latex gloves and tried to "wipe everything off" the Probe.

{¶ 18} Scott then drove the Probe toward Hartville and "ditched the car" near a vacant building. Before leaving, he squirted lighter fluid on the front seat, back seat, and dashboard but could not set the car ablaze, as neither he nor Vadasz had matches. The two then walked back to Akron.

{¶ 19} On Tuesday, September 14, the police obtained Stoffer's telephone records showing that on the day of the test drive, a telephone call had been made to the Stoffer home from Anthony Scott's residence. When the police contacted him, Anthony reported that Scott and Vadasz had used his phone on that date.

Anthony later told Scott what he had told the police, and Scott replied that "he was thinking about killing [Anthony] and [his] girlfriend and [his] kids."

{¶ 20} On the same day, the police received an anonymous telephone call linking Scott to Green's murder. Until they received that call, Scott had not been a suspect in that murder.

{¶ 21} The next day, a representative from the Stark County Sheriff's Office and the Canton Police Department arrested Scott. Vadasz cooperated with law enforcement by leading them to Stoffer's body and his car and by consenting to a search of her home. During that search, police recovered a .22-caliber Smith & Wesson revolver, a box of .22-caliber ammunition, and bloodstained clothing belonging to Scott. They also recovered the seatbelt from the Probe that had been thrown into the sewer.

{¶ 22} Police Lieutenant Michael Firth interviewed Scott about Stoffer's murder. Scott provided a detailed confession consistent with the facts outlined herein. Detectives then asked him about Green's murder. He initially denied any involvement but then blurted out, "[O]kay, I did it," and provided a detailed account of Green's murder.

{¶ 23} The Stark County Grand Jury subsequently returned a seven-count indictment against him, charging him with the murder of Dallas Green, the aggravated murder of Stoffer with prior calculation and design, the aggravated murder of Stoffer while committing kidnapping and/or aggravated robbery, the aggravated robbery of Stoffer, the kidnapping of Stoffer, and two counts of possession of a firearm while under a disability. The first five counts also included firearm specifications. Additionally, the two counts of aggravated murder each contained the following three death penalty specifications: murder while committing or attempting to commit an aggravated robbery, R.C. 2929.04(A)(7), murder while committing or attempting to commit kidnapping, R.C. 2929.04(A)(7), and murder as part of a course of conduct involving the purposeful killing of two or more persons, R.C. 2929.04(A)(5). Prior to trial, Scott pled guilty to the two counts of possession of a firearm while under a disability; the court then conducted a jury trial on the remaining counts and specifications.

{¶ 24} At trial, the state presented Scott's confession, the eyewitness testimony of Allen and Wilson, and other corroborating evidence, including forensic evidence linking Scott to the murders of Green and Stoffer. The defense presented no evidence during the guilt phase of trial. After closing arguments, the court instructed the jury, and, following its deliberations, the jury returned verdicts finding Scott guilty of all counts and specifications.

{¶ 25} During the penalty phase of the aggravated murder conviction, Scott called 13 witnesses and offered additional documentary evidence of his chemical

dependency, of the child abuse he had suffered until age four, and other mitigating circumstances. In rebuttal, the state called a probation officer who testified that Scott had not missed any of 23 scheduled appointments and had only once tested positive for marijuana between March 15 and September 15, 1999. Following its penalty-phase deliberations, the jury recommended that Scott be sentenced to death for the aggravated murder of Stoffer. The court followed the recommendation and imposed the death penalty upon Scott. It also sentenced him to consecutive terms of imprisonment of 15 years to life for the murder of Green, three years on each of two firearm specifications, ten years for the aggravated robbery conviction, ten years for the kidnapping conviction, and one year on each of the two counts of having a weapon while under a disability.

{¶ 26} From that judgment, Scott appeals as a matter of right.

## TRIAL ISSUES

### Sufficiency and Manifest Weight of the Evidence

{¶ 27} Scott separately challenges the sufficiency and the manifest weight of the evidence with respect to each death-penalty specification: murder while committing kidnapping, murder while committing aggravated robbery, and murder as part of a course of conduct involving the killing of two or more persons.

{¶ 28} Regarding the kidnapping specification, Scott contends that the record contains insufficient evidence of animus for the kidnapping separate from the animus for the aggravated murder. He further urges us to find that his conviction on that specification is against the manifest weight of the evidence. Scott makes the same arguments with regard to the aggravated robbery specification.

{¶ 29} Regarding the course-of-conduct specification, Scott argues that the state failed to provide sufficient evidence of a nexus between the Green and Stoffer murders, in that they occurred 19 days apart and involved different sets of circumstances, i.e., he spontaneously killed Green without robbing him, but he planned to kill Stoffer and take his vehicle. He uses this same rationale in arguing that this conviction is against the manifest weight of the evidence.

{¶ 30} Although both are raised by Scott in one proposition of law, a challenge to the sufficiency of evidence is different from a challenge to the manifest weight of the evidence.

{¶ 31} A claim of insufficient evidence invokes a due process concern and raises the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541; *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. In reviewing such a challenge, "[t]he relevant inquiry is

whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶ 32} A claim that a jury verdict is against the manifest weight of the evidence, on the other hand, involves a separate and distinct test that is much broader. " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 33} Here, the record refutes Scott's sufficiency challenges. In addition to Scott's confession, in which he admitted driving around Canton with Stoffer for an hour and a half, while Stoffer kept directing Vadasz to drive toward his grandmother's house, killing him, and taking his vehicle, the state presented corroborating evidence of the kidnapping and the robbery. The state's evidence included the bloodstained seatbelt, Stoffer's body, the murder weapon, ammunition, the stolen vehicle, and testimony by Stoffer's mother that Stoffer anticipated that the test drive, transaction, and drive home from his grandmother's house would take less than an hour, all of which support the conclusion that, after construing that evidence most strongly in favor of the prosecution, a rational trier of fact could have found Scott guilty of the kidnapping and aggravated robbery specifications. See *State v. Lawson* (1992), 64 Ohio St.3d 336, 349, 595 N.E.2d 902 (prolonged restraint was not incidental to murder and clearly constituted a separate and distinct act).

{¶ 34} "The 'course of conduct' specification applies to multiple murders that an offender commits as part of a continuing course of criminal conduct, even if the offender does not necessarily commit them as part of the same transaction." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 71; see, also, *State v. Benner* (1988), 40 Ohio St.3d 301, 304–305, 533 N.E.2d 701.

{¶ 35} Here, after killing Green, Scott threatened to kill Wilson and Allen if they told anyone about the murder; both testified that they had failed to report that killing because they had feared for their safety. Scott later bragged to Jewell that he had killed Green.

{¶ 36} On several occasions after the Green killing, Scott told his friends that he planned to test drive a vehicle, kill the owner, and take the car. He then induced one of his girlfriends to help him carry out his plan; he killed Stoffer and, thereafter, told Jewell that he had done so. And, he also threatened to kill

his own brother, Anthony, and Anthony's girlfriend and children after Anthony provided incriminating evidence to police.

{¶ 37} While Scott argues that killing Green was separate and distinct from killing Stoffer, the pattern of conduct he exhibited in the spontaneous execution of Green for no apparent reason, his bragging about that killing, and the threats he made to those who could report it, combined with his forecast of the Stoffer murder, the cold-blooded manner in which he carried it out, the threats he made surrounding that killing, and his bragging to Jewell about it, all suggest a deliberate effort by Scott to earn a reputation as an indiscriminate killer bent on enhancing his influence in the community by causing others to fear him. Accordingly, construing the evidence most strongly in favor of the state, a rational trier of fact could have found Scott guilty of the course-of-conduct specification, and therefore, the trial court did not err in overruling Scott's challenge to the sufficiency of that evidence.

{¶ 38} Regarding Scott's manifest-weight challenges to the three death-penalty specifications, Scott did not present any evidence during the guilt phase of trial; consequently, no evidence contradicts his confession establishing these specifications or the evidence corroborating them. Accordingly, after carefully reviewing the record, weighing the evidence, and considering the credibility of the witnesses, we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice in finding the three death-penalty specifications proven beyond a reasonable doubt.

{¶ 39} Based on the foregoing, we overrule this proposition of law.

### Ineffective Assistance of Counsel

{¶ 40} Scott argues that his trial counsel's failure to object to testimony about his having had sexual intercourse with Amber Harsh after killing Green denied him effective assistance of counsel. He contends that the testimony not only prejudiced him during the guilt phase of trial but also incited the jury to recommend the death sentence.

{¶ 41} To establish ineffective assistance of counsel, Scott must demonstrate that counsel's performance fell below the objective standard of reasonable competence and that there is a reasonable probability that, but for such deficiency, the outcome of the trial would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus.

{¶ 42} Here, the record reflects that after shooting Green, Scott went with Allen and Wilson to Harsh's apartment. Wilson testified that he thought Scott and Harsh had had sex in her bedroom that night. Allen then corroborated

Wilson's testimony. Scott's counsel did not object to the testimony. Although an objection might have been sustained, counsel's failure to object does not rise to the level of ineffective assistance of counsel under the *Strickland* test. Other evidence presented by the state, including Scott's confession to the police and to his friends, established his guilt of the charges. Given this evidence, Scott has not met his burden under *Strickland* to demonstrate that the outcome of the trial would have been different if his counsel had objected to the testimony about his sexual relations on the night he killed Green. Further, Scott's claim that this testimony incited the jury to recommend the death penalty is merely conjecture. Accordingly, Scott's claim of ineffective assistance of counsel is not well taken, and we therefore overrule this proposition of law.

### Sympathetic Outbursts

{¶ 43} Scott claims that the trial court erred in overruling his motions for mistrial regarding crying by Stoffer's family members during trial, which, he argues, enhanced jury sympathy for Stoffer and his family, thereby depriving him of a fair trial.

{¶ 44} A capital trial generates strong emotion and "cannot be squeezed dry of all feeling." *State v. Keenan* (1993), 66 Ohio St.3d 402, 408–409, 613 N.E.2d 203; *State v. White* (1999), 85 Ohio St.3d 433, 440, 709 N.E.2d 140. Accordingly, a trial court must determine, as a question of fact, whether an emotional outburst in a murder trial deprived the defendant of a fair trial by improperly influencing the jury. *State v. Benge* (1996), 75 Ohio St.3d 136, 144, 661 N.E.2d 1019; *State v. Morales* (1987), 32 Ohio St.3d 252, 255, 513 N.E.2d 267; *State v. Bradley* (1965), 3 Ohio St.2d 38, 32 O.O.2d 21, 209 N.E.2d 215, syllabus. "In the absence of clear, affirmative evidence to the contrary, the trial court's determination will not be disturbed." *Morales*, 32 Ohio St.3d at 255, 513 N.E.2d 267.

{¶ 45} Here, prior to the state's presenting any witnesses, the defense objected to Brenda Stoffer's remaining in the courtroom after she testified. Brenda was the mother of one of the victims, and the defense argued that the introduction of photographs, the victim's clothing, and graphic testimony would inevitably cause her to cry in the jury's presence and thereby prejudicially affect Scott's ability to be fairly tried. The trial court overruled the objection and permitted her to remain in the courtroom.

{¶ 46} During Jewell's testimony, defense counsel moved for a mistrial, asserting that Mrs. Stoffer had been crying and that some of the jurors had also cried. The prosecutor agreed that at least one of the jurors had cried. The court overruled the motion, stating, "[F]rom my vantage point I neither heard nor observed Mrs. Stoffer becoming emotional at all."

{¶ 47} Thereafter, when Harry Campbell, an investigator from the coroner's office, testified, defense counsel again informed the court that Stoffer's family members were crying and that the jurors were watching them. Based on this conduct, the defense again moved for a mistrial, which the court denied because it did not "notice[e] any disruption whatsoever."

{¶ 48} Thus, any emotion exhibited by Stoffer's family members did not create a disruption observable by the trial court judge. Moreover, the court cautioned jurors to focus on the evidence and to disregard extrinsic matters in their decisionmaking. Accordingly, the court did not err in overruling Scott's motions for a mistrial.

## SETTLED ISSUES

### Reasonable Doubt

{¶ 49} Scott challenges the trial court's reasonable-doubt instruction and the definition of reasonable doubt contained in R.C. 2901.05. This court, however, has previously rejected this challenge. *State v. Jones* (2000), 90 Ohio St.3d 403, 417, 739 N.E.2d 300; *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 232, 594 N.E.2d 604; *State v. Nabozny* (1978), 54 Ohio St.2d 195, 8 O.O.3d 181, 375 N.E.2d 784, paragraph two of the syllabus. Consequently, this proposition of law is not well taken.

### Consecutive Sentences

{¶ 50} Scott asserts that the trial court lacked the authority to impose prison sentences consecutive to his death sentence. We rejected this argument in *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 142. See, also, *State v. Moore* (1998), 81 Ohio St.3d 22, 38, 689 N.E.2d 1; *State v. Campbell* (1994), 69 Ohio St.3d 38, 52, 630 N.E.2d 339. As noted in these cases, the prison sentence is rendered moot by the execution of the defendant's death sentence. Thus, this proposition of law is not well taken.

### Proportionality

{¶ 51} We next address Scott's contention that Ohio's proportionality review is unconstitutional. Specifically, he urges that a meaningful proportionality review should include cases resulting in life imprisonment after a capital-sentencing hearing, as well as those resulting in the imposition of the death penalty. We have consistently held that the proportionality review required by R.C. 2929.05(A) is satisfied by a review of cases in which the death penalty has been imposed. See *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 23; *State v. Smith* (1997), 80 Ohio St.3d 89, 118, 684 N.E.2d 668; *State v. Steffen*

(1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus. Consequently, these propositions of law are overruled.

### Constitutionality

{¶ 52} Additionally, Scott argues that R.C. 2929.04(B)(7), which allows the jury to consider "[a]ny other factors" as potential mitigating factors, is unconstitutional because it "permit[s] the sentencer to convert the defendant's (B)(7), or 'catchall,' mitigation into reasons for *imposing* the death penalty." (Emphasis sic.) And he alleges that the court's jury charge, which followed the statutory language, exacerbated these flaws.

{¶ 53} We have previously considered and overruled these arguments. See *State v. Stallings* (2000), 89 Ohio St.3d 280, 298, 731 N.E.2d 159; *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 129–131. Further, the trial court did not lead the jurors to believe, through its instructions or otherwise, that other mitigating factors could be used to justify the death penalty. Accordingly, we overrule this challenge.

{¶ 54} Separately, Scott challenges the constitutionality of Ohio's death penalty statutes, and we summarily reject these challenges. See *State v. Carter* (2000), 89 Ohio St.3d 593, 606–608, 734 N.E.2d 345; *State v. Clemons* (1998), 82 Ohio St.3d 438, 454, 696 N.E.2d 1009; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

## ADDITIONAL CONSIDERATIONS

### Concession of Guilt

{¶ 55} Although Scott did not raise the issue, we note that during opening statement, defense counsel conceded Scott's guilt to all of the offenses and death-penalty specifications, except the course-of-conduct specification, giving rise to the question of whether Scott received effective assistance of counsel.

{¶ 56} As previously discussed, in order to establish ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below the objective standard of reasonable competence and that there exists a reasonable probability that, but for such deficiency, the outcome of the proceedings would have been different. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus. Furthermore, a defendant must overcome the strong presumption that, under the circumstances, the decision might be considered sound trial strategy. See *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 57} " 'Concessions of guilt, in any form, are among the most troublesome actions a defense counsel can [t]ake * * *.' *State v. Goodwin* (1999), 84 Ohio

St.3d 331, 336, 703 N.E.2d 1251, 1258. Nevertheless, such concessions are not *per se* ineffective but must be analyzed under *Strickland* for deficiency and prejudice." *State v. Campbell* (2000), 90 Ohio St.3d 320, 337, 738 N.E.2d 1178.

{¶ 58} Here, prior to trial, defense counsel moved to have the Green and Stoffer murders tried separately, but the court denied the motion. Having lost that position, defense counsel stated during his opening statement:

{¶ 59} "We would tell you that there is no question in this case that the evidence will support findings of guilty to the charges in the indictment. We do not intend to contest that evidence. Mr. Scott confessed to these matters almost immediately upon being contacted by police. The evidence of guilt is quite clear. We don't intend to take issue with the elements of the offenses except for one of the specifications, and that is the course of conduct."

{¶ 60} With these concessions, counsel focused the jury's attention on Scott's most plausible defense: the state's inability to prove the course-of-conduct specification. Had Scott succeeded in obtaining an acquittal on that specification, he would have strengthened his appellate challenge to the court's denial of his request to have the Green and Stoffer cases tried separately.

{¶ 61} Additionally, by conceding Scott's guilt to those charges for which the state had overwhelming evidence of guilt, including Scott's confession, counsel enhanced his credibility with the jury to plead for Scott's life. See, generally, *Goodwin,* 84 Ohio St.3d at 337, 703 N.E.2d 1251. Based on the foregoing, we cannot say that defense counsel's decision to concede guilt to all but the course-of-conduct specification was not a rational trial strategy.

{¶ 62} Furthermore, given the overwhelming evidence of Scott's guilt, even if counsel's performance did fall below the objective standard of reasonable competence in that regard, there is not a reasonable probability that, but for the deficient performance, the outcome of the trial would have been different. Accordingly, Scott cannot demonstrate a denial of effective assistance of counsel.

### *Erroneous Advice on Making an Unsworn Statement*

{¶ 63} Defense counsel misadvised Scott regarding the consequences of making an unsworn statement during the penalty phase of trial, telling him: "If you make that unsworn, oral statement, the prosecutors are permitted to comment on the fact that you, quote, didn't have the courage to get on the witness stand, wouldn't subject yourself to cross-examination, and make other argument to the jury indicating, you know, their disdain for your unsworn, oral statement." After being so advised, Scott declined to make an unsworn statement.

{¶ 64} "A defendant's unsworn statement is often a critical part of defense mitigation." *State v. Lynch,* 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 110. A prosecutor's right to comment on a defendant's unsworn statement,

however, is limited. See *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph two of the syllabus; *State v. Davis* (1996), 76 Ohio St.3d 107, 120, 666 N.E.2d 1099. "[T]he prosecution may comment that the defendant's statement has not been made under oath or affirmation, but such comment must be limited to reminding the jury that the defendant's statement was not made under oath, in contrast to the testimony of all other witnesses." *DePew* at paragraph two of the syllabus.

{¶ 65} Here, defense counsel misadvised Scott that the prosecutor could express disdain for his unsworn statement and unfavorably comment upon Scott's lack of courage to testify under oath and subject himself to cross-examination. See *State v. Jackson* (1991), 57 Ohio St.3d 29, 40, 565 N.E.2d 549. Counsel's actions, however, do not rise to the level of ineffective assistance of counsel under the *Strickland* test. Cf. *State v. Xie* (1992), 62 Ohio St.3d 521, 524–525, 584 N.E.2d 715 (defense counsel's misadvice on parole eligibility during plea bargaining constituted deficient performance, but not prejudicial error).

### Exclusion of mitigation

{¶ 66} Although Scott has not challenged the trial court's decision to exclude information regarding the minimum and maximum sentences he could receive for his noncapital offenses and its refusal to permit him to refer to these potential sentences during the penalty-phase closing argument, we review this issue sua sponte.

{¶ 67} "In Eighth Amendment jurisprudence, mitigating factors are facts about the defendant's character, background, or record, or the circumstances of the offense, that may call for a penalty less than death." *State v. White* (1999), 85 Ohio St.3d 433, 448, 709 N.E.2d 140. However, "[t]he length of incarceration to be served by the defendant before parole eligibility is not a fact about the defendant's character or background, or about the circumstances of the offense." Id.; see, also, *O'Dell v. Netherland* (1997), 521 U.S. 151, 162–168, 117 S.Ct. 1969, 138 L.Ed.2d 351. Accordingly, information about sentences for noncapital offenses is not a mitigating factor with regard to the Eighth Amendment. *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 114.

{¶ 68} Furthermore, the term of imprisonment for noncapital offenses is not a mitigating factor pursuant to R.C. 2929.04(B)(7) that requires the sentencer to consider and weigh against the aggravating circumstances "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death." If such penalties were considered to be mitigating factors, then the more noncapital offenses a defendant committed, the greater would be the mitigation. This is an illogical conclusion, which we reject.

44

{¶ 69} Accordingly, in the present case, the trial court did not err by excluding information and argument about the minimum and maximum sentences Scott could receive for his noncapital offenses.

## INDEPENDENT SENTENCE EVALUATION

### *Aggravating Circumstances*

{¶ 70} The evidence established that Scott was properly convicted of three death penalty specifications for aggravated murder: murder while committing, attempting to commit, or fleeing after committing aggravated robbery, R.C. 2929.04(A)(7); murder while committing, attempting to commit, or fleeing after committing kidnapping, R.C. 2929.04(A)(7); and murder as part of a course of conduct involving the purposeful killing of two or more persons, R.C. 2929.04(A)(5).

### *Mitigation Evidence*

{¶ 71} During the penalty phase of trial, Scott called 13 witnesses and introduced documentary evidence for the jury's consideration.

{¶ 72} Kathleen Thompson, a social service worker for the Stark County Department of Human Services, testified that the department had arranged for Scott's placement in the Canton, Ohio, foster home of Katherine Wilson in 1981 because his mother had abused him. His mother had beaten him with a belt and punched him with her fists, causing hearing loss and damage to a kidney. Human Services placed Jason and Anthony, Scott's two brothers, into a separate foster home.

{¶ 73} Scott adjusted to living with Wilson but continued to live separately from his brothers. Approximately four years after being placed in foster care, Scott exhibited behavioral problems, such as destroying other children's toys. He also had hearing problems, requiring tubes to be surgically inserted into his ears. Later that year, Scott's behavioral problems worsened, and he injured another boy with a screwdriver. When Scott was eight and a half years old, he "urinat[ed] on the wall * * *, pull[ed] his pants down, [and] act[ed] out" at school.

{¶ 74} The following year, although Wilson loved Scott and had bonded with him, Human Services removed him from Wilson's home because of "his acting out behavior and because of Mrs. Wilson's declining health and inability to handle [Scott]." At that time, Human Services placed him with the Scott family, and they later adopted him.

{¶ 75} Lisa Ann Hall, a foster child at the Wilson home when Scott lived there, testified that Wilson and Scott had had a very close relationship, "just like a regular mother and son." She explained that, because of the abuse that Scott

had suffered, Wilson "just kind of took him under her wing more so than the other kids. He was shown a lot of attention."

{¶ 76} Jerry Schweitzer, a chemical-dependency counselor, provided Scott's mother, Julia, counseling after she was admitted into the Interval Brotherhood Home, a long-term, inpatient drug and alcohol treatment center in Akron. Julia indicated that she began using drugs and alcohol at 18 years of age. According to Julia, her drug and alcohol abuse became problematic at the age of 21 because "she was staying out on the streets and not taking care of her baby."

{¶ 77} Patrice Turner, Julia's neighbor in 1979, witnessed Julia's treatment of Scott and babysat for him when he was about three years old. Turner testified that Julia had called Scott a "little bastard" and had told him that "she didn't want him." Turner also had observed marks on Scott's body where Julia had "hit him with the belt" and stated that most of the time, it looked as if he had been beaten with the buckle end. According to Turner, as a result of the physical abuse, Scott had "bruises on his legs, his hands and things like that." She also noted that Scott's face had sometimes been "bruised up" and that he had had cigarette burns on his back.

{¶ 78} Turner testified that when Julia used drugs or alcohol, she would scream at her children and become violent. For example, Julia "would hit them, blame them for something that maybe a man had did to her or somebody else." Additionally, because Julia would run out of food near the end of the month, Turner often fed Scott and his brother.

{¶ 79} Larry Perretta, a retired psychologist for Canton City Schools, testified that he evaluated Scott in 1985 because Scott had exhibited academic difficulties and behavioral problems. At that time, Scott, a second-grade student, had been held back in school for one year. Testing showed that Scott had an IQ of 86 on the Stanford–Binet Intelligence Scale, which placed him in the low-average range. Scott further scored 85 for reading and spelling and 94 for arithmetic on other aptitude tests for which scoring is similar to that of the IQ test. Results of the Woodcock Johnson Psycho-educational Battery Test showed Scott to be "slightly below his ability level in the reading, spelling, written language areas and right in line with or slightly above his ability level in math."

{¶ 80} Scott had not qualified for special education services because there had not been a sufficient discrepancy between his ability and achievement levels. Perretta, however, noted that Scott had appeared to suffer from attention deficit hyperactivity disorder ("ADHD") because he had difficulty sitting still and maintaining concentration in class and would often pester other students. Thus, Perretta had recommended that Scott continue to receive counseling and that he have a medical evaluation to determine whether he had ADHD.

{¶ 81} In March 1987, a psychologist reevaluated Scott, then nine years old, due to his "ongoing behavioral problems." Teachers had reported that Scott "experienced problems in the lunch room, on the playground, [and] coming to and from school where he was occasionally physically aggressive toward other students."

{¶ 82} At that time, the Wechsler Intelligence Scale for Children showed Scott to have an IQ of 92, similar to his earlier results. Scott's human-figure drawing test showed normal cognitive functioning and some indications of aggression. On the "hands test," a test that involves showing a child a series of pictures of hands in various positions and asking the child to describe what the hands are doing, Scott gave a high number of "acting-out type responses."

{¶ 83} As a result of the evaluation, professionals recommended that he be placed in a more structured classroom environment because of his difficulty with self-control. Additionally, Perretta testified that it had again been recommended that Scott receive a medical evaluation, and he was placed on medication and assigned to a class for the learning disabled the following year. An addendum to the 1987 report indicated that Scott's behavior had improved when he took his medication, and he had eventually returned to a normal classroom.

{¶ 84} Timothy Shaughnessy, a licensed independent social worker and a mitigation specialist, testified that the Stark County Department of Human Services had acted incompetently by failing to provide adequate supervision of Julia and failing to ensure Scott's and his brothers' safety at home. According to Shaughnessy, social-service workers failed to act on numerous complaints about Julia's abuse and neglect of Scott, despite having previously removed Scott's older brother, Kelly, from the home.

{¶ 85} During the time that Scott lived with Julia, social workers found her home littered and dirty and noticed a lack of food in the house. They also received complaints that Julia beat her children and frequently left them home alone. On one occasion, social workers visiting her home saw marijuana cigarettes.

{¶ 86} In June 1981, when questioned by social workers about belt marks on Scott's body, Julia maintained that "[s]he was going to continue using the belt because it worked, [and] that was the only way to make him listen." During the next three months, social workers received additional reports that Julia physically abused Scott and his brothers and, in September, observed bruises and scabs on Scott's arm and back and a lump on his back near his kidney. Julia admitted that she had hit Scott with the belt because he had refused to go to bed. The following month, after Julia admitted hitting him again, Human Services placed Scott, then four years old, into foster care with Wilson.

{¶ 87} In Shaughnessy's opinion, Wilson provided Scott with a loving home; however, Wilson's age, chronic illness, and responsibility for a large number of other children living with her limited the amount of attention Wilson could devote to Scott. According to Shaughnessy, Scott also lacked a male role model.

{¶ 88} When Scott was ten years old, the Scott family took him into their home, reunited him with his brothers, and adopted him. The Scotts lived in a nice neighborhood and provided him with a stable and loving home environment. Scott also attended church with his family, who were Jehovah's Witnesses.

{¶ 89} The Scotts were strict parents and set high standards for Scott. When Scott was a teenager, tensions developed between him and his parents over their rules. Scott began experimenting with drugs and alcohol. Further, church elders denied his request to be baptized because they felt that he did not behave properly. Soon after his 18th birthday, Scott left his parents' home.

{¶ 90} Shaughnessy testified that in his opinion, Scott then became dependent upon alcohol, marijuana, and cocaine. Moreover, Scott had a genetic predisposition for chemical dependency because several close relatives, including his mother, grandparents, aunts, and uncles, suffered from drug and alcohol addictions. According to Shaughnessy, Scott used drugs and alcohol as "a way to cope with his pain, with his abusive childhood, his despair of * * * being yanked around from home to home, person to person."

{¶ 91} Shaughnessy further testified that, according to Scott, by late 1997, he had been consuming a fifth of whiskey on a daily basis up until two days before his arrest on murder charges. Despite these facts, Scott claimed to have been sober on the day of the crimes against Stoffer.

{¶ 92} Bruce Sampsel, a clinical psychologist, evaluated Scott in 1986 after he had been referred for treatment by the Canton City Schools. According to Sampsel, Scott displayed a lack of control and disrespect for authority. He also developed a "neediness" relating to the absence of a father figure and his mother's abandoning him. After meeting with Scott on 37 occasions, Sampsel concluded that Scott had moderate to severe problems controlling his behavior and following rules.

{¶ 93} Frederick Scott and his wife adopted Scott's two younger brothers and later adopted Scott, then 11 years of age. Scott adapted well to the family; however, Mr. Scott noticed a change in his behavior when he turned 17 years of age. Then, a couple of days after his 18th birthday, Scott dropped out of high school and moved out of his parents' home. At trial, Mr. Scott maintained that despite the current situation, he would not abandon his son because "there was an attachment made there that goes beyond life."

{¶ 94} Tanise Michelle Scott, Scott's sister, was 12 or 13 years old when Scott moved into the family home. She had had a good relationship with him, which she attributed to their closeness in age. She related that, at 18 years of age, Scott began having problems with their parents because "he wanted to do what he wanted to do" and made a poor choice of friends.

{¶ 95} Bettie J. Scott explained that she and her husband had adopted Scott and his brothers because they loved them. The Scotts developed a good relationship with Scott until he was approximately 17 years old. At that point, Scott began making bad decisions, including his choice of friends. Despite her opposition, he left home to be with some of his friends. The Scotts did not know where he lived after leaving their home and had scant contact with him thereafter.

{¶ 96} Jason Scott considers his brother Scott to be his best friend and continues to maintain as much contact with him as possible. Jason declared the day Scott left home to be the "[w]orst day of [his] life."

{¶ 97} Dr. Robert Smith, a court-appointed psychologist, evaluated Scott and concluded that he was sane and competent to stand trial. He diagnosed Scott as suffering from "[a]ttention deficit disorder and hyperactivity disorder; dysthymia, which is a form of depression; and borderline personality disorder." Dr. Smith indicated that Scott had suffered from these disorders at the time he committed the offenses. Additionally, Dr. Smith diagnosed him as alcohol and cannabis dependent.

{¶ 98} Julia Mae Williams testified that on July 23, 1977, she gave birth to Scott, who was premature and weighed only two pounds, two ounces. Julia related that Scott's natural father, Michael Dean Turner, had gone to the penitentiary when Scott was two years old.

{¶ 99} Julia admitted abusing Scott, including striking him with a switch, and smoking marijuana about every other day. She attended programs to combat her drug and alcohol problems and claimed to have never missed a meeting. These addictions, however, led her to neglect her children and eventually caused her to lose custody. She supported her drug and alcohol use by stealing, engaging in prostitution, and selling food stamps. She has a felony conviction for receiving stolen property.

{¶ 100} Scott neither testified nor made an unsworn statement during the penalty phase of trial. In allocution, however, Scott acknowledged that he failed to "ever really think about the consequences" of his actions and that he "took responsibility for what [he] did, and to [him] that's the main key." He also apologized to the Stoffer and the Green families.

### Rebuttal Evidence

{¶ 101} David Kollar, a Stark County law enforcement officer, contacted Scott weekly between March 15 and September 15, 1999. During that period, Scott tested positive for marijuana on only one of eight occasions. Further, the day after Green's murder, he tested negative for drugs. Kollar also testified that Scott had not missed any of his 23 scheduled appointments and that he had never exhibited any signs of drug or alcohol use during these meetings. Further, Scott worked sporadically for a temporary-employment service.

### Sentence Evaluation

{¶ 102} We find nothing in the nature and circumstances of the aggravated murder of Stoffer to be mitigating. Scott killed Green, threatened to kill Allen and Wilson if they told anyone about the murder, and then bragged to Jewell about the killing. He subsequently informed his friends of his plan to steal a car and kill the owner. Scott then carried out the plan and shot Stoffer six times in the back of the head and took his vehicle. These facts establish a premeditated murder committed during aggravated robbery and kidnapping and as part of a course of conduct involving the purposeful killing of two persons. The murder lacks any mitigating features.

{¶ 103} Scott's history, background, and character, however, provide some mitigation. His birth mother, a habitual drug user, abused him and paid little attention to his welfare. These experiences traumatized Scott; however, at four years of age, Scott began living with a loving and caring foster mother. For the next six years, she took care of most of his needs. Later, the Scott family reunited him with his two brothers and eventually adopted him. The Scotts loved him and provided a stable home environment. Despite living with these caring families for the majority of his childhood, Scott left home at 18 years of age, dropped out of high school, and became a drug and alcohol abuser.

{¶ 104} After carefully reviewing the record, we find that the following statutory mitigating factors are inapplicable: R.C. 2929.04(B)(1) (inducement by victim); (B)(2) (duress, coercion, or strong provocation); (B)(3) (mental disease or defect); (B)(5) (lack of a criminal record); and (B)(6) (accomplice only).

{¶ 105} Because Scott was 22 years old at the time of the offenses, the R.C. 2929.04(B)(4) (youth of the offender) mitigating factor is entitled to some weight. See *State v. Jackson* (2001), 92 Ohio St.3d 436, 452, 751 N.E.2d 946; *State v. White*, 85 Ohio St.3d at 454, 709 N.E.2d 140; but, cf., *State v. Ballew* (1996), 76 Ohio St.3d 244, 257, 667 N.E.2d 369 ("R.C. 2929.04[B][4] [youth] [is] entitled to little weight, since Ballew was twenty-two at the time of the offense").

{¶ 106} Moreover, although Scott's mental disorders do not qualify as mental diseases or defects within the meaning of R.C. 2929.04(B)(3), his ADHD, dysthy-

mia, borderline personality disorder, and chemical dependency are entitled to some weight under R.C. 2929.04(B)(7), as they undoubtedly played a role in his crimes. See *State v. Carter*, 89 Ohio St.3d at 610, 734 N.E.2d 345 (antisocial and borderline personality disorder entitled to "some weight" under [B][7] ); *State v. Johnson*, 88 Ohio St.3d at 123, 723 N.E.2d 1054 (defendant's personality disorder and drug dependence entitled to very little weight in mitigation).

{¶ 107} Significantly, the record indicates that Scott does not suffer from mental retardation. Two separate intelligence tests determined his IQ to be 86 or 92. Accordingly, his execution is not barred by *Atkins v. Virginia* (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335; see, also, *State v. Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011.

{¶ 108} In conclusion, Scott's youth, his early childhood, his mental disorders, and his history of drug and alcohol abuse are entitled to weight in mitigation. These factors, however, are outweighed by the aggravating circumstances of aggravated robbery, kidnapping, and course of conduct in killing Green and Stoffer. Accordingly, after thoroughly reviewing the record and upon an independent weighing, we hold that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

{¶ 109} Finally, we find that imposing the death penalty in this case is proportionate to death sentences approved in similar cases: for course-of-conduct murders, see *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439; *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 749 N.E.2d 226; *State v. Cornwell* (1999), 86 Ohio St.3d 560, 715 N.E.2d 1144; for kidnapping-murders, see *State v. Hartman*, 93 Ohio St.3d 274, 754 N.E.2d 1150; *State v. Ballew*, 76 Ohio St.3d 244, 667 N.E.2d 369; *State v. Joseph* (1995), 73 Ohio St.3d 450, 653 N.E.2d 285; and for aggravated-robbery-murder cases, see *State v. Jackson*, 92 Ohio St.3d 436, 751 N.E.2d 946; *State v. Stallings*, 89 Ohio St.3d 280, 731 N.E.2d 159; *State v. Baston* (1999), 85 Ohio St.3d 418, 709 N.E.2d 128. Based on the foregoing, we hold that the death sentence in the present case is appropriate.

{¶ 110} Accordingly, we affirm Scott's convictions and sentence of death.

Judgment affirmed.

MOYER, C.J., RESNICK, F.E. SWEENEY, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

PFEIFER, J., dissents.

---

**PFEIFER, J., dissenting.**

{¶ 111} As I have stated before, "the constitutional purpose of statutory aggravating circumstances is to narrow the class of murderers to those deserving society's ultimate punishment, the death penalty." *State v. O'Neal* (2000), 87

Ohio St.3d 402, 421, 721 N.E.2d 73 (Pfeifer, J., dissenting), citing *Zant v. Stephens* (1983), 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235. This court's broad interpretation of the course-of-conduct death specification in this case calls into question whether under that interpretation that death specification fulfills its constitutional purpose of narrowing the class of murderers deserving the death penalty.

{¶ 112} The trial court's decision to permit the jury to consider the course-of-conduct death specification in this case is inextricably related to its decision to allow the two murder counts to be tried together. Though it is impossible to show that being presented with evidence of both murders influenced the jury's decisions, it is equally impossible to show that it did not. I believe that holding a dual trial, however economical of judicial resources, was error.

{¶ 113} This court's continued reluctance to establish a clear standard for determining whether two murders occurred as part of a course of conduct will only result in more course-of-conduct cases like this one. The two murders were unrelated, occurred 19 days apart, and involved two people that had no relation to each other. The two murders were not committed in a similar way, were not committed in the same transaction, and were not committed for a common reason. In short, the only thing the two murders had in common was the murderer.

{¶ 114} The majority's conclusion that the two murders were part of a course of conduct because Scott was making a "deliberate effort * * * to earn a reputation as an indiscriminate killer" is cursory. I do not blame the prosecutor for bringing the course-of-conduct charge. I blame this court for not setting an appropriate standard for determining what constitutes a course of conduct involving the purposeful killing of or attempt to kill two or more persons.

{¶ 115} I have been in the majority in several decisions upholding a sentence of death based, at least in part, on a course-of-conduct death specification when the facts supported the specification. See *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 749 N.E.2d 226 (defendant committed two murders in the same house, at approximately the same time, and in a similar manner); *State v. Awkal* (1996), 76 Ohio St.3d 324, 667 N.E.2d 960 (defendant killed two people at the same time with the same weapon); and *State v. Dunlap* (1995), 73 Ohio St.3d 308, 652 N.E.2d 988 (defendant committed second murder ten days after the first murder, while committing a robbery to facilitate his flight from the law). The two murders in this case were not committed as part of a course of conduct.

{¶ 116} Furthermore, there was ample evidence to support other death-penalty specifications, rendering the course-of-conduct specification unnecessary. I would reverse the course-of-conduct death specification. I dissent.

John D. Ferrero Jr., Stark County Prosecuting Attorney, and Ronald Mark Caldwell, Assistant Prosecuting Attorney, for appellee.

Annette L. Powers, for appellant.