JUDGMENT ENTRY.
This appeal is considered on the accelerated calendar under App.R. 11.1(E) and Loc.R. 12, and this Judgment Entry shall not be considered an Opinion of the Court pursuant to S.Ct.R.Rep.Op. 3(A).
Defendant-appellant Dale Roark appeals his convictions for two counts of gambling,[1] four counts of money laundering,[2] and one count each of violating the rules for conducting bingo,[3] operating a gambling house,[4] conspiracy,[5] and engaging in a pattern of corrupt activity.[6] Because none of his assignments of error has merit, we affirm the judgment of the trial court.
Roark and his wife, Eila Roark, were founders of Roark Learning Centers and Center Concept Awards, nonprofit organizations established to provide childcare. In 1996, a bingo operation was established in Norwood, Ohio (the "Norwood Bingo"), in an effort to raise money for Roark Learning Centers. The operation was very successful, and in 2000, a second operation was established in Roselawn, Ohio (the "Valley Center Bingo"). In addition to bingo games, instant bingo tickets were sold at the bingo locations.
The testimony elicited at the trial before the court was that both bingo operations were staffed by "volunteers." Contrary to the nomenclature, the "volunteers" were compensated for their work. On most occasions, they received approximately $100 for each night that they worked. Witnesses testified that the compensation took place upon the orders of Roark. Bingo workers with more responsibility received more compensation. For example, Robert Segal had managed the Norwood Bingo and at times had received $1,000 per night. Stu Willis, who was responsible for managing the instant-bingo booth, had received between $18,000 or $19,000 in cash from January to August 2001. In 1997, Roark ordered Willis to give him $1,000 from the instant-bingo proceeds every week. According to Willis, this amount, which grew to $2,000 a week by 1999, was set aside in a lockbox for a "rainy-day fund." Willis estimated that, from 1997 to 2001, he had given Roark $300,000 for the rainy-day fund. According to Willis, the rainy-day fund was to be used for improvements to the bingo operations. Further, Roark told Willis that the fund would be used as a "severance" for Roark, Willis, and Segal when "[they were] done."
In 1998, Roark approached Willis about the possibility of purchasing Ben's Department Store[7] from Ben Schottenstein. According to Willis, Roark indicated that they needed to give Schottenstein a $50,000 deposit to review his financial records. Willis stated that this money had come from the rainy-day fund. After Willis had examined Schottenstein's financial records, he advised against purchasing the business. Eventually, Schottenstein returned the deposit. According to Willis, Roark signed over to Willis a check from Schottenstein for $9,000. Robert Segal testified that he had been given three checks from Ben's Department Store that had been made out to his mother for $9,000. In mid-1998, Roark again approached Willis about the purchase of a business. This time the business was Tatman's Transportation. Willis testified that he had invested some of his own money and that Roark had invested money from the rainy-day fund. By the time the business arrangement with Tatman's Transportation had ended, Willis had been repaid most of his investment, and Roark had been paid at least $30,000 with checks drawn on Tatman's Transportation's account.
The money used to pay the workers and to sustain the rainy-day fund was concealed through various accounting maneuvers. One practice was to replace the cash withdrawn with promotional coupons that had not been redeemed by bingo customers. A second method was the sale of instant tickets that had been bought with cash in order to keep them off the accounting books. A third way involved slot-like video machines that were leased for the bingo operations. Nick Stephens, who had managed the instant bingo at the Valley Center Bingo, had been ordered by Roark to sign a lease for the machines. According to Stephens, the profits from the machines were evenly divided with the company that had leased the machines. Further, some cartridges had been purchased with cash and kept off the invoices. This allowed some of the profits to be kept off the books of the bingo operations. According to Stephens, two-thirds of the profits from the bingo machines was given to the nonprofit organizations and one-third "[had gone] to cover for [sic] all the volunteers, and Dale and Bob and Stu and everybody else * * *."
Questions about the legality of the machines resulted in the investigation of the bingo operations.[8] In August 2001, sheriff deputies, pursuant to search warrants, raided Norwood Bingo and Valley Center Bingo. Information about the compensation of volunteers and the skimming of money from the operations arose during interviews with the bingo workers. As a result, Roark was indicted on eleven charges, including several gambling counts and one count of carrying a concealed weapon. His wife, Eila Roark, and Robert Segal were also indicted on gambling and conspiracy charges. Eila Roark pleaded no contest to gambling and violating the rules for conducting bingo. After a trial to the court, Dale Roark was found guilty of all the charges except for carrying a concealed weapon. For the misdemeanor offenses, he was ordered to pay court costs. He was sentenced to three years on each of the felony counts. The sentences were to be served concurrently. In addition to the prison term, Roark was also ordered to pay a total of $75,000 in fines for the felony counts.[9]
In his first assignment of error, Roark contends that his counsel was ineffective. To prevail on this assignment of error, Roark must demonstrate that his counsel's performance was deficient and that, absent his counsel's error, the result of the trial would have been different.[10] Our review of counsel's performance must be "highly deferential."[11]
Roark's contention that his counsel was ineffective focuses on two areas. First, he claims that he was not provided conflict-free assistance of counsel. To prevail on this contention, Roark must demonstrate that there existed an actual conflict that affected his counsel's performance.[12] We conclude that Roark has not met this burden. At trial, Roark was represented by two attorneys. One of the attorneys had represented his wife in her no-contest plea to the charges of gambling and violating the rules of bingo. The record reveals that Roark's attorney stated that Roark had asked him to assist in his representation and that Roark had waived any potential conflict of interest. The record does not demonstrate that there was any conflict that affected his attorney's representation. Roark argues that the trial court should have conducted an inquiry into the issue. But a trial court's duty to inquire into the matter arises only "when the court knows or reasonably should know of an attorney's possible conflict of interest."[13]
In this case, that duty was not triggered, as Roark himself had requested that his counsel represent him, and there was no indication of a conflict in the record.
As part of his argument that he did not received conflict-free representation, Roark also asserts that the trial court should have recused itself from the proceedings after having accepted Eila Roark's no-contest plea, and that his counsel was ineffective for not requesting a recusal. But "[a] judge's involvement in a plea bargain agreement of a co-defendant does not mandate disqualification."[14] Absent any evidence of bias on the part of the trial court, the trial court's recusal was not required, and in turn counsel was not ineffective for failing to request a recusal.
Roark also contends that he was denied effective assistance of counsel because his counsel conceded his guilt for the misdemeanor offenses. During closing arguments, Roark's counsel admitted that Roark had compensated himself and the bingo workers. Counsel's concessions of guilt are reviewed under the same Strickland standard we have already discussed.[15]
We are unable to conclude that counsel's performance was deficient. The evidence that Roark had compensated himself and the bingo workers from the bingo funds was uncontroverted. The concession of Roark's guilt with respect to these offenses may have be a tactic used to preserve counsel's credibility with respect to the other, more serious offenses. Further, given the overwhelming evidence against Roark with respect to these offenses, even if counsel's performance was deficient, the outcome of the trial would not have been different. The first assignment of error is overruled.
Roark's second assignment of error is that his convictions for money laundering were not supported by sufficient evidence. Specifically, Roark contends that insufficient evidence was presented with respect to the seventh through ninth counts, which were three of the four money-laundering charges. To determine whether the evidence was sufficient to support the money-laundering convictions, we must examine the evidence presented at trial and determine whether the evidence, viewed in a light most favorable to the state, could have convinced any rational trier of fact that Roark was guilty beyond a reasonable doubt.[16]
The seventh count stated that Roark "did conduct or attempt to conduct a transaction knowing that the property involved in the transaction is the proceeds of some form of unlawful activity with intent to conceal or disguise the nature, location, source, ownership, or control of the property * * *." Roark claims that the state did not introduce sufficient evidence that Roark had given money to either Ben Schottenstein for the purchase of Ben's Department Store or to Tatman's Transportation. But the state did present evidence through the testimony of Stu Willis and Robert Segal that Roark had transferred money from the rainy-day fund to the businesses. Further, the record demonstrates that there was sufficient evidence that the purpose of these transactions was to conceal the nature of the rainy-day fund.
In the eighth count, Roark was charged with "conduct[ing] or attempt[ing] to conduct a transaction with the purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on of corrupt activity." Roark contends that the bingo operations had not been established as corrupt activities and that the Roark Learning Center and Center Concept Awards had benefited from the operations. While the evidence did show that the charities had receive money from the bingo proceeds, the state also presented sufficient evidence that money had been skimmed from the proceeds to pay workers and to maintain the rainy-day fund.
The ninth count alleged that Roark "did conduct or structure or attempt to conduct or structure a transaction that involves the proceeds of corrupt activity that has a value greater than $10,000 and, at the time, [Roark] knew or had reasonable cause to know that the transaction involved the proceeds of corrupt activity." As we have already discussed, with respect to seventh count, the state presented sufficient evidence of transactions greater than $10,000 that were conducted with the rainy-day money.
Although Roark's assignment of error raises only the sufficiency of the evidence against him, his brief and his argument also question by implication the weight of the evidence against him. Having reviewed the record, we conclude that the state presented ample evidence of money laundering, and we cannot say that the trial court lost its way in finding him guilty of these offenses. Accordingly, the second assignment of error is overruled.
In his third assignment of error, Roark claims that the trial court erred in denying his motion for a new trial and for a judgment of acquittal. Roark's motion for a new trial and for a judgment of acquittal was centered on his contention that the statute of limitations had run on the misdemeanor offenses. The issue was raised for the first time after trial court had rendered its finding of guilt, and, therefore, Roark waived the issue.[17] The third assignment of error is overruled.
The final assignment of error is that the trial court's imposition of fines totaling $75,000 was excessive.[18]
Roark argues that the trial court did not consider whether he had the ability to pay the fines. R.C. 2929.18(E) states that a court "may hold a hearing if necessary to determine whether the offender is able to pay the sanction or is likely in the future to be able to pay it." A hearing is not mandatory. Given that the evidence presented to the trial court was that Roark had skimmed at least $250,000 from the bingo operations, the trial court had no reason to question Roark's ability to pay. Accordingly, we conclude that the trial court did not error in failing to hold a hearing on the issue. Further, the fines were not objected to at the time of sentencing. The issue was thus waived for purposes of appeal.[19] The fourth assignment of error is without merit.
Therefore, the judgment of the trial court is affirmed.
Further, a certified copy of this Judgment Entry shall constitute the mandate, which shall be sent to the trial court under App.R. 27. Costs shall be taxed under App.R. 24.
Doan, P.J., Painter and Sundermann, JJ.
[1] R.C. 2915.02(A)(2).
[2] R.C. 1315.55(A)(1) through (4).
[3] R.C. 2915.09(B)(1).
[4] R.C. 2915.03(A)(1).
[5] R.C. 2923.01(A)(1).
[6] R.C. 2923.32.
[7] The business is also referred to as "Ben's Fine Clothing."
[8] The legality of the machines is not at issue in this appeal.
[9] Roark was ordered to pay $10,000 for counts six through nine (money laundering), $15,000 for count ten (conspiracy), and $20,000 for count eleven (engaging in a pattern of corrupt activity).
[10] State v. Bradley (1989), 42 Ohio St.3d 136, 142,538 N.E.2d 373; Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052.
[11] Strickland, supra, at 689.
[12] State v. Leonard (2004), 157 Ohio App.3d 653, 664,813 N.E.2d 50. See, also, Wood v. Georgia (1981), 450 U.S. 261,101 S.Ct. 1097.
[13] State v. Gillard (1992), 64 Ohio St.3d 304,595 N.E.2d 878, syllabus. See, also, Leonard, supra.
[14] In re Disqualification of Krichbaum (1997),81 Ohio St.3d 1205, 1206, 688 N.E.2d 511, citing In re Disqualificationof Corrigan (1996), 77 Ohio St.3d 1243, 674 N.E.2d 355.
[15] See State v. Goodwin (1999), 84 Ohio St.3d 331, 337,703 N.E.2d 1251; State v. Scott (2004), 101 Ohio St.3d 31, 41,800 N.E.2d 1133.
[16] See State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus.
[17] See State v. Brown (1988), 43 Ohio App.3d 39,539 N.E.2d 1159; State v. Grant, 12th Dist. No. CA2003-05-114, 2004-Ohio-2810.
[18] Roark states that the fines violated the Eighth Amendment to the United States Constitution and R.C. 2929.14(C). But R.C.2929.14(C) concerns maximum sentences and is not implicated by this assignment of error.
[19] State v. Williams (1977), 51 Ohio St.2d 112,364 N.E.2d 1364. See, also, State v. Harris, 8th Dist. No. 83288,2004-Ohio-2854.