OPINION
{¶ 1} Defendant-appellant, John Butler, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of one count of aggravated murder, with a specification, and one count of aggravated robbery.
 {¶ 2} This case arises from a homicide that occurred during New Year's weekend, December 29, 1995, to January 1, 1996. On January 1, 1996, Cheryl Davis was found dead in her apartment by her parents.
 {¶ 3} On April 10, 1998, defendant was indicted by the Franklin County Grand Jury on one count of aggravated murder with a specification and one count of aggravated robbery. The jury convicted defendant on both counts. The trial court sentenced defendant to a 30 years to life prison term for his aggravated murder conviction and a ten to 25 years prison term for his aggravated robbery conviction, to run consecutively. Defendant appealed to this court.
 {¶ 4} On June 22, 2000, this court reversed the convictions, finding that the trial court erred by admitting into evidence statements defendant made to his wife during an improper custodial interrogation. See State v. Butler (June 22, 2000), Franklin App. No. 99AP-302 ("ButlerI"). This court also concluded that sufficient evidence existed to support defendant's convictions. See id.
 {¶ 5} The trial court conducted a new trial. Defendant was again convicted on both counts, and the trial court sentenced defendant to serve terms of imprisonment of 30 years to life and ten to 25 years, to run consecutively. Defendant again appealed to this court.
 {¶ 6} On March 28, 2002, this court reversed the convictions, finding statements of the prosecutor, which were made during closing argument, to be improper and prejudicial. See State v. Butler (Mar. 28, 2002), Franklin App. No. 01AP-590 ("Butler II"). This court determined that the following statements of the prosecutor, made during closing arguments, were improper and prejudicial, warranting reversal of the convictions:
Basically, if I had to sum up this case in just a few words, I can tell you that the defendant cannot explain the unexplainable. He cannot account for it. He cannot dismiss it. He can't even address it. * * *
The defendant cannot account for having this ring. This defendant cannot account for selling this ring. This defendant cannot account for interfering with these witnesses. This defendant cannot account for his multiple versions of where he was that night. He cannot account for the fact that he repeatedly said that he hated an innocent person who had never meant him any harm.
See Butler II, quoting the trial transcript. In reaching the above finding, this court determined that the case was similar to State v.Clark (1991), 74 Ohio App.3d 151. In Clark, the prosecutor, in closing argument, stated as follows: "George [the decedent] can't talk, Clark [the defendant] won't." Id. at 156, quoting the trial transcript. TheClark court, at 160, found the prosecutor's comment, on the defendant's refusal to testify, improper and prejudicial.
 {¶ 7} Additionally, this court, in Butler II, just as in Butler I,
found sufficient evidence to support defendant's convictions. The cause was once again remanded to the trial court.
 {¶ 8} In June 2003, a third trial was commenced. Defendant was again convicted on both counts. The trial court sentenced defendant to life without parole eligibility for 30 full years of imprisonment on the aggravated murder count and nine to 25 years of imprisonment on the aggravated robbery count, to be served consecutively. Defendant appeals from this judgment and assigns the following errors:
1, The trial court erred in permitting the prosecutor to make an impermissible closing argument which called attention to the fact that John Butler did not testify in his own defense.
2. The trial court erred in failing to grant a mistrial after a profane outburst from a key prosecution witness.
3. The trial court erred in admitting records from the United States Bankruptcy Court as evidence against John Butler.
4. The trial court erred in overruling the Criminal Rule 29 motions presented on John Butler's behalf because the evidence was not sufficient to sustain the convictions.
5. The verdicts were against the manifest weight of the evidence.
 {¶ 9} By his first assignment of error, defendant argues that the trial court committed reversible error in permitting the prosecutor to draw attention to the fact that defendant did not testify at trial. Defendant specifically points to the following statement of the prosecutor, arguing that it was both improper and prejudicial:
* * * But you know what? As bad as they can make Matt look, the Defendant, in all of his many statements, has never volunteered anything about having this ring. You know that's what the cops are gonna want to talk to him about. They don't want to hear about Matt's birthday or Christmas presents and D.C. and everything. All he has to say is, "I got the ring," and all of a sudden, this investigation will take a completely different tone.
(Tr. Vol. V., at 159-160.) Defense counsel objected to this statement. A conference was held out of the hearing of the jury, and the court stated, "You're getting close, Cowboy," and overruled the objection. (Tr. Vol. V, at 160.) Defense counsel also moved for a mistrial, and the trial court overruled that motion.
 {¶ 10} Defendant argues that the prosecutor's statement in closing argument "contains a bald-faced lie." (Defendant's merit brief, at 8.) In support of the proposition that the statement is false, defendant cites to a conversation that he had with Detective Sharon Cecketti. Defendant essentially argues that the prosecutor's statement was improper, in view of a statement that defendant made to Detective Cecketti. We find this argument to be unpersuasive.
 {¶ 11} In general, prosecutors are given considerable latitude in opening statement and closing argument. State v. Ballew (1996),76 Ohio St.3d 244, 255. In closing argument, a prosecutor may comment on "`what the evidence has shown and what reasonable inferences may be drawn therefrom.'" State v. Lott (1990), 51 Ohio St.3d 160, 165, quoting Statev. Stephens (1970), 24 Ohio St.2d 76, 82.
 {¶ 12} In Butler I, this court determined that the post-arrest custodial interrogation of defendant by Detective Cecketti was improper. In Butler I, this court concluded that defendant's incriminating statements he made to his wife during the improper custodial interrogation should not have been admitted into evidence. During this improper interrogation, defendant apparently told Detective Cecketti that he had removed the engagement ring from Ms. Davis's finger. See ButlerI. Statements defendant made during this improper interrogation were not admitted into evidence in the third trial.
 {¶ 13} Testimony regarding various statements defendant made, prior to his arrest, was admitted into evidence in the third trial. However, we observe that there was no evidence admitted in the third trial demonstrating that defendant ever volunteered, in pre-arrest statements, his knowledge regarding the diamond ring. Thus, the prosecutor's statement was consistent with, and limited to, the evidence admitted in the third trial. Moreover, the fact that the prosecutor, when he made the statement in closing argument, may have subjectively known that defendant had made a statement to police regarding the ring, is not significant. The prosecutor properly limited his statement to the evidence admitted at the third trial and any reasonable inferences arising therefrom.
 {¶ 14} Defendant also argues that the prosecutor's statement "clearly was intended to draw the jury's attention to John Butler's supposed silence with police and his actual silence at trial." (Defendant's merit brief, at 8.) It is improper for a prosecutor to comment on a defendant's failure to testify. State v. Fears (1999), 86 Ohio St.3d 329, 336, citingGriffin v. California (1965), 380 U.S. 609, 85 S.Ct. 1229; State v.Cooper (1977), 52 Ohio St.2d 163, 173; and State v. Webb (1994),70 Ohio St.3d 325, 328-329.
 {¶ 15} The test for prosecutorial misconduct in referring to a defendant's failure to testify is "whether the language used wasmanifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." (Emphasis sic.) Webb, supra, at 328, quoting Knowlesv. United States (C.A.10, 1955), 224 F.2d 168, 170.
 {¶ 16} Even though, in isolation, the prosecutor's statement appears to refer to defendant's action or inaction in the present tense, or as being ongoing, when it is analyzed in context, we cannot conclude that the prosecutor's statement was an improper comment on defendant's decision not to testify. In the statement at issue, the prosecutor said, "Defendant, in all of his many statements, has never volunteered anything about having this ring." The prosecutor referred to "the cops" as wanting to talk to defendant about the ring. The prosecutor stated that "[a]ll he has to say is, `I got the ring.'"
 {¶ 17} The evidence admitted at trial revealed that defendant had made various pre-arrest statements regarding Ms. Davis to police investigators as well as to others. However, in the statements admitted at trial, defendant made no reference to the diamond ring that Ms. Davis had worn prior to her death. We note again that the incriminating statements defendant allegedly made to his wife during the improper custodial interrogation were not admitted into evidence in the third trial. Thus, in effect, the jury had no knowledge that defendant allegedly made incriminating statements to the police, and/or in the presence of the police, during an improper custodial interrogation. Therefore, in the context of all the statements that defendant made that were pre-arrest and admitted into evidence, defendant did not inform anyone that he had been in possession of the diamond ring. Significantly, the state, in its closing argument, made multiple references to the various statements of defendant that were admitted into evidence prior to making the allegedly improper comment.
 {¶ 18} Although the prosecutor's statement was in the present tense, when viewed in context, we do not view it as an attempt of the prosecutor to focus the jury's attention on defendant's decision not to testify or to be of such character that the jury would naturally and necessarily take it to be a comment on the failure of defendant to testify.
 {¶ 19} Based on the foregoing, we conclude that the prosecutor did not commit prosecutorial misconduct in closing argument, and we therefore overrule defendant's first assignment of error.
 {¶ 20} By his second assignment of error, defendant argues that the trial court erred by not granting a mistrial after an outburst by a state witness. We disagree.
 {¶ 21} Matt Stuller testified as follows:
Q. After the death of Cheryl Davis, did you ever associate with John Butler after that?
A. We had talked. I helped him move, him and his wife and the baby to another apartment.
And he said, man, I know you're going through a lot right now. If there is anything that I can do, call. I'm here for you.
You fucking liar.
[Defense counsel]: Object, your honor.
[Mr. Stuller]: Excuse my language.
The Court: Settle down there.
[Mr. Stuller]: Sorry, I'm sorry.
[Defense counsel]: Objection, your honor.
(Tr. Vol. III, at 293.) Immediately thereafter, a discussion was held outside the presence of the jury. Defendant moved for a mistrial, which was overruled by the court. Following the discussion, and a 15-minute recess, the court gave the following admonition:
Mr. Stuller, what we want from you and what you know and what you see or have seen or saw and what you heard, we don't want any emotion. We don't want any emotional outbursts from you in the future.
[Mr. Stuller]: I apologize.
The Court: Okay. Ladies and gentlemen, on the last outburst by Mr. Stuller, please disregard anything that he may have said during that emotional outburst. That's not good testimony in this case and it should be disregarded by you. So, with that [assistant prosecutor] you may continue your direct examination of the witness.
(Tr. Vol. III, at 299-300.)
 {¶ 22} The decision to grant or deny a mistrial is a matter within the sound discretion of the trial court. State v. Glover (1988),35 Ohio St.3d 18. Regarding outbursts by witnesses, the Supreme Court of Ohio, in State v. Hill (1996), 75 Ohio St.3d 195, at 204, stated:
The impact of emotional outbursts at trial by witnesses or spectators cannot be judged by an appellate court on a cold record. "Was the jury disturbed, alarmed, shocked or deeply moved? * * * These questions necessarily depend on facts which no record can reflect." State v.Bradley (1965), 3 Ohio St.2d 38, 40, 32 O.O.2d 21, 22, 209 N.E.2d 215,216. Normally, only the trial judge can make the necessary factual determinations on these questions. "[H]is findings thereon will not be disturbed on review in the absence of evidence on the face of the record clearly and affirmatively showing that the jury was improperly affected * * *." Bradley at 41, 32 O.O.2d at 22, 209 N.E.2d at 217. Accord Statev. Morales (1987), 32 Ohio St.3d 252, 255, 513 N.E.2d 267, 271.
 {¶ 23} We find nothing in the record to indicate that the jury was improperly affected by Mr. Stuller's emotional outburst. Additionally, the court's admonition given to the witness, advising the witness to refrain from any more emotional outbursts, and the corresponding admonition given to the jury, advising the jury to disregard the witness's emotional outburst, mitigated any prejudicial effect of the outburst.
 {¶ 24} Therefore, in view of the record, which includes the court's admonitions given to Mr. Stuller and the jury, we conclude that the trial court did not abuse its discretion in overruling defendant's motion for a mistrial, which was premised on Mr. Stuller's voluntary outburst during his testimony. Accordingly, we overrule defendant's second assignment of error.
 {¶ 25} By his third assignment of error, defendant argues that the trial court erred by not excluding from evidence the records from the United States Bankruptcy Court. According to defendant, the bankruptcy records were not relevant to any issue in dispute, or, alternatively, the records were otherwise inadmissible under Evid.R. 403(A).
 {¶ 26} When the prosecution offered bankruptcy court filings into evidence, defendant objected. The transcript reveals that defendant objected on the basis that the evidence was not relevant. The court observed that "[i]t's a stretch," but permitted the admission of the bankruptcy court filings, noting that the evidence need only tend to show a fact of consequence. (Tr. Vol. V, at 18.)
 {¶ 27} Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pursuant to Evid.R. 402, "[e]vidence which is not relevant is not admissible." The bankruptcy court filings provide insight into the financial situation of defendant around the time of the homicide and arguably indicate that defendant was under financial pressure at that time. Considering defendant was charged with aggravated robbery, in addition to aggravated murder, we conclude that the trial court did not abuse its discretion in not excluding the bankruptcy court filings on the basis of irrelevance.
 {¶ 28} Defendant argues on appeal that the bankruptcy court filings were inadmissible under Evid.R. 403(A), which provides: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." We observe that defendant did not object to the bankruptcy court filings on the basis that, even if relevant, the evidence should be excluded by Evid.R. 403(A). It was not plain error for the trial court not to exclude the bankruptcy court filings based on Evid.R. 403(A).
 {¶ 29} Even assuming defendant did not waive his Evid.R. 403(A) argument, it was not an abuse of discretion for the trial court not to apply Evid.R. 403(A). Defendant, in his reply brief, seems to argue that he was prejudiced by the admission of the bankruptcy court filings because bankruptcy is negatively viewed by members of our society. Defendant's argument to the contrary, we conclude that, although the probative value of the bankruptcy court filings may have been minimal, it was not substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Moreover, the probative value of the bankruptcy court filings was not substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence. See Evid.R. 403(B).
 {¶ 30} Considering the foregoing, we overrule defendant's third assignment of error.
 {¶ 31} In his fourth assignment of error, defendant asserts that his convictions were not supported by sufficient evidence and therefore the trial court erred in denying his Crim.R. 29(C) motion. By his fifth assignment of error, defendant argues that the verdicts were against the manifest weight of the evidence. Because defendant's fourth and fifth assignments of error are interrelated, we will address them together.
 {¶ 32} A conviction that is based on insufficient evidence constitutes a denial of due process. State v. Thompkins (1997), 78 Ohio St.3d 380, 386; see State v. Scott, 101 Ohio St.3d 31, 2004-Ohio-10, at ¶ 31. When determining the sufficiency of the evidence, an appellate court must "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. Whether the evidence is legally sufficient to sustain a verdict is a question of law, not fact.Thompkins, at 386. Additionally, we note that circumstantial evidence and direct evidence inherently possess the same probative value. Jenks, at paragraph one of the syllabus.
 {¶ 33} Regarding the weight of evidence, the Supreme Court of Ohio, in Thompkins, stated as follows:
* * * Weight of the evidence concerns "the inclination of the greateramount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greateramount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on itseffect in inducing belief."
(Emphasis sic.) Id. at 387, quoting Black's Law Dictionary (6 Ed. 1990) 1594.
 {¶ 34} Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. When assessing whether a conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and ultimately determine "`whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"Thompkins, at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172,175. Furthermore, "`[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id.
 {¶ 35} In the case at bar, defendant was convicted of aggravated murder, in violation of R.C. 2903.01, with a specification. R.C. 2903.01
makes it unlawful for a person to purposely cause the death of another while committing or attempting to commit, inter alia, aggravated robbery. Defendant was also convicted of aggravated robbery, in violation of R.C. 2911.01. R.C. 2911.01 makes it unlawful for a person to inflict or attempt to inflict serious physical harm on another while committing a theft offense.
 {¶ 36} Considering the nature of Ms. Davis's physical injuries and the condition of her apartment, it is clear that she was purposely killed. Additionally, the evidence at trial supported a finding that defendant, John Butler, purposely caused Ms. Davis's death while committing, or attempting to commit, aggravated robbery.
 {¶ 37} Ms. Davis was found dead in her apartment wearing a pair of long underwear and a long black coat. She was not wearing shoes. Testimony indicated that, during the wintertime, Ms. Davis wore long underwear underneath medical "scrubs" when she worked as a veterinarian assistant at a veterinarian clinic. Testimony also revealed that Ms. Davis likely would not have been dressed as she was if she expected company. The area in which Ms. Davis was found was littered with debris, including broken glass from a curio cabinet. Injuries to Ms. Davis's hands were consistent with a finding that Ms. Davis struggled with her assailant. There was no sign of forced entry.
 {¶ 38} Testimony at trial indicated that Ms. Davis was very safety conscious. For example, testimony indicated that Ms. Davis always locked her door and would not unlock and open her apartment door for strangers. Also, according to Timothy Duboe, a friend and former roommate of Ms. Davis, unannounced visitors caused stress to Ms. Davis. Mr. Duboe testified that, when he lived with Ms. Davis, defendant would arrive at their apartment, unannounced. Michelle Wolfe, another former roommate of Ms. Davis, testified that defendant would visit their apartment three or four times per week. When asked whether defendant would "call first and say, `I'm coming over,'" Ms. Wolfe stated, "No." (Tr. Vol. IV, at 92.)
 {¶ 39} The prosecution introduced evidence demonstrating that defendant sold the diamond ring that was forcibly removed from Ms. Davis's left hand ring finger to Sebastian Reyna for a fraction of its appraised value. Mr. Reyna testified that defendant approached him, regarding the possible sale and purchase of the diamond ring, on January 4, 1996, a few days after Ms. Davis was murdered. According to Mr. Reyna, defendant offered to sell the ring for three or four hundred dollars. Mr. Reyna had the ring appraised, prior to purchasing it. Mr. Reyna testified that the ring was appraised at around $1,600 or $1,800. Mr. Reyna purchased the ring from defendant for $200, paying defendant in cash and check.
 {¶ 40} The evidence at trial also indicated that defendant, in early January 1996, had "marks" on his body. Mr. Reyna testified that he observed markings on defendant on their first day back to work after the New Year's day holiday. According to Mr. Reyna, he noticed "scratches, marks" on defendant's shoulder and "upper arm." (Tr. Vol. III, at 402.) There was testimony at trial that defendant said that he obtained the scratches in a bar fight. There was also testimony that defendant said the scratches were from a fight at the gym.
 {¶ 41} The issue of the length of Ms. Davis's fingernails, as it related to the alleged scratches on defendant's body, was raised at trial. Testimony at trial indicated that investigators requested that the underside of Ms. Davis's fingernails be scraped for possible evidence. Testimony revealed that scraping the underside of her fingernails was not feasible, as they were too short. Also, the parties stipulated that Ms. Davis's best friend, who was a nail technician, would have testified that she had attempted to apply artificial nails on Ms. Davis's fingers in order to "better present her engagement ring, but Ms. Davis' fingernails were so short that nothing could get under her nails. For that reason, artificial fingernails could not be applied." (Tr. Vol. V, at 61.)
 {¶ 42} On appeal, defendant contests the significance of the alleged scratches on the body of defendant. Defendant correctly observes that Ms. Davis's fingernails were not scraped for evidence after the homicide because they were too short, and that Ms. Davis's friend was unable to apply artificial nails to Ms. Davis's nails. However, the fact that fingernail scrapings were not collected in this case and the fact that the artificial nails could not be applied by Ms. Davis's friend do not negate the reasonable inference that defendant's scratches or marks on his body, which were observed within days of the homicide, were directly connected to the struggle that occurred in Ms. Davis's apartment that resulted in her brutal murder.
 {¶ 43} Although Ms. Davis's fingernails may have been too short to be scraped on their undersides and too short to have artificial nails applied to them, she indeed had fingernails at the time of her death. Additionally, we note that there was evidence that the diamond ring was forcibly removed from her left-hand ring finger, which leads to the reasonable inference that Ms. Davis was wearing the ring at the time of the struggle.[1] Moreover, the evidence at trial demonstrated that debris, including broken glass from a curio cabinet, littered the apartment after the homicide.
 {¶ 44} A former co-worker of defendant, Lovell Romans, testified that, in January 1996, defendant, in reference to Ms. Davis's murder, said that he had been out with her that night and dropped her off and he said that he may have been the last one to see her alive. According to Mr. Romans, defendant said that he got the scratches on his body in a bar fight. Tonya Underwood, a co-worker of Ms. Davis at the veterinarian clinic, testified that she last spoke with Ms. Davis over the telephone at 7:45 p.m., on Friday December 29, 1995.
 {¶ 45} Another former co-worker of defendant, Jim Cornwell, testified that defendant told him that he hated Ms. Davis and wished she was dead, and that defendant seemed upset when he made this statement. According to Ms. Wolfe, defendant expressed frustration to her regarding Ms. Davis. In a conversation that occurred a few months before the homicide, defendant told Ms. Wolfe that he was very upset with Ms. Davis for the way she was treating Mr. Stuller and his son. Based on this conversation, Ms. Wolfe viewed defendant as being "very upset with Cheryl. Very upset." (Tr. Vol. IV, at 102.)
 {¶ 46} Shortly after Ms. Davis was murdered, defendant made suspicious statements, arguably implicating guilt. John Mitchell testified that on the day after Ms. Davis's body was discovered, defendant called him on the telephone. Mr. Mitchell testified regarding this conversation as follows:
[Mr. Mitchell]: He started asking questions about how long fingerprints lasted, how long investigations like this would go on. Just started asking all kinds of weird questions. Wasn't concerned about her, it was more like "me".
Q. When you say "me", you mean Mr. Butler?
A. Yes.
(Tr. Vol. IV, at 34.) Detective James McCoskey, an investigator with the Columbus Police Department, testified that he conducted an interview with defendant in August 1996, and that defendant was not under arrest or in custody at the time of the interview. According to Detective McCoskey, defendant informed him that he had asked about how long fingerprints last because he was aware that Matt Stuller had been interviewed by the police and that these questions were natural questions regarding the investigation of Ms. Davis's murder. (See Tr. Vol. V., at 12-13.)
 {¶ 47} Nissa Ebert testified that defendant told her that he and Mr. Stuller had alibis regarding their possible involvement in Ms. Davis's homicide, specifically telling her that Mr. Stuller was in New York City and that he was at his family's house for the holidays, and he did not leave for four days. When asked whether defendant used the term "alibi," Ms. Ebert stated that he used that term. (Tr. Vol. II, at 217.) Ms. Wolfe learned that Ms. Davis had been murdered when defendant called her on January 1, 1996, between 10 and 10:30 p.m. According to Ms. Wolfe, after defendant told her that Ms. Davis had been murdered, he told her that he had been informed that Mr. Stuller had been arrested, and he said that Mr. Stuller could not have committed the murder because he was in Washington that weekend.
 {¶ 48} Mr. Mitchell testified that, in his conversations with defendant in early January 1996, defendant told him about different places he had been on Friday, December 29, 1995. Defendant told Mr. Mitchell that he had gone to UDF to get milk on that Friday. In another conversation, which occurred the next day, defendant told Mr. Mitchell that he had gone to Meijer to return a videotape. Also, according to Mr. Mitchell, defendant told him that he had gotten the scratches on his body during a fight at the gym on that Friday night. According to Mr. Mitchell, "it was always about Friday night." (Tr. Vol. IV, at 69.) Mr. Mitchell testified that defendant said, "the only thing I did" when he referred to where he had been. Id. Regarding when the homicide occurred, the parties stipulated that if Dr. Patrick Fardal had been recalled to testify, he would have testified that, to a reasonable degree of medical certainty, Ms. Davis's time of death was 72 to 96 hours before he examined her body on Tuesday morning, January 2, 1996.
 {¶ 49} Defendant argues that the trier of fact had to impermissibly stack inference upon inference in order to find that he was guilty in this case. We find defendant's argument unpersuasive. As this court observed in Butler II, "an inference which is based in part upon an inference and in part upon facts is a parallel inference and permissible, if reasonable." Id., citing State v. Ebright (1983),11 Ohio App.3d 97, 99. Considering the evidence admitted at trial, we conclude that the trier of fact did not need to impermissibly stack inference upon inference in order to convict defendant of aggravated murder with a specification and aggravated robbery. It was reasonable to infer from the evidence that defendant committed aggravated murder with a specification and aggravated robbery.
 {¶ 50} Therefore, upon our examination of the evidence in a light most favorable to the prosecution, we find sufficient evidence to support defendant's convictions for aggravated murder with a specification and aggravated robbery. The trial court did not err in denying defendant's Crim.R. 29(C) motion.
 {¶ 51} Moreover, we conclude that the verdicts were not against the manifest weight of the evidence. We note that the weight to be given to the evidence and the credibility of the witnesses are determinations that are primarily for the trier of fact. See DeHass, supra, at paragraph one of the syllabus. Here, there is no indication that the jury lost its way or created a manifest miscarriage of justice in convicting defendant of aggravated murder with a specification and aggravated robbery. This is not a case where the evidence weighs heavily against defendant's convictions.
 {¶ 52} Accordingly, we overrule defendant's fourth and fifth assignments of error.
 {¶ 53} For the foregoing reasons, all five of defendant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
Bryant and Lazarus, JJ., concur.
[1] Carol Davis, the victim's mother, testified that her daughter continued to wear the diamond ring even after her daughter's engagement with Matt Stuller had been broken off. Carol Davis identified a photograph taken Christmas Day 1995 as showing her daughter wearing the diamond ring. Apparently, Ms. Davis continued to wear the engagement ring after breaking up with Mr. Stuller because Mr. Stuller owed Ms. Davis money for clothing that she had purchased for him.