[Cite as *State v. Brown*, 2013-Ohio-5391.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 13AP-164 |
| | | (C.P.C. No. 12CR-986) |
| Irvin M. Brown, | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

# D E C I S I O N

### Rendered on December 10, 2013

*Ron O'Brien*, Prosecuting Attorney, and *Valerie B. Swanson*, for appellee.

*R. William Meeks Co., LPA,* and *David H. Thomas*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

TYACK, J.

{¶ 1} Defendant-appellant, Irvin M. Brown ("appellant"), is appealing his convictions on one count of felonious assault and two counts of kidnapping in the Franklin County Court of Common Pleas. For the following reasons, we affirm the judgment of the trial court.

{¶ 2} Appellant assigns four errors for our consideration:

> [I.] The prosecuting attorney's remarks during closing arguments constituted prosecutorial misconduct which deprived Appellant of a fair trial in violation of the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.

[II.] The Appellant's trial counsel's failure to object to the prosecutor's improper statements during closing arguments deprived him of his rights to a fair trial, effective assistance of counsel, and due process of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and comparable provisions of the Ohio Constitution.

[III.] The trial court erred by overruling Appellant's Criminal Rule 29 Motion for Judgment of Acquittal, as the prosecution failed to offer sufficient evidence to prove beyond a reasonable doubt each and every element of the crimes charged, and thereby deprived Appellant of due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.

[IV.] The trial court erred and thereby deprived Appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution by finding Appellant guilty of two counts of kidnapping and one count of felonious assault, as the verdicts were against the manifest weight of the evidence.

### Factual and Procedural History

{¶ 3} The prosecution presented the following at trial. In the fall of 2011, appellant met both Laurika Starks and Andrea Bostic. The women were neighbors who lived in adjoining units in an apartment complex. Appellant and Starks began to have a sexual relationship around November 2011. Starks ended the relationship in January 2012 because appellant had issues within himself and he was being argumentative. After the relationship ended with Starks, appellant began to have a sexual relationship with Bostic.

{¶ 4} On February 12, 2012, Bostic asked appellant to leave her apartment and ended the relationship saying that she did not want him in her house on account of her kids. Starks then let appellant into her apartment around noon on February 12, because they were still friends and cordial with one another. Appellant ignored Starks for most of the day. From about noon until midnight he was focused on a laptop computer and

talking to family. He also communicated with various people on Facebook during this time. Starks said it was clear he was upset.

{¶ 5} We cannot tell from the evidentiary record before us whether or not Starks ever asked appellant to leave before he put a gun in her face. In her testimony at trial, Starks jumped right to the point where appellant is pointing a gun at her face without any explanation how the situation escalated. She stated she was terrified and could not leave because of the gun. Appellant initially pulled the gun around midnight. Starks then tried to talk him out of her apartment to get him to leave.

{¶ 6} Starks said that appellant kept playing with the ammunition clip by taking it in and out of the gun. She testified she was able to take the clip when he put it down and hide it in the couch. Appellant apparently forced Starks to pray multiple times while pointing the gun at her, and asked her whether she loved Jesus and if she loved Tupac.

{¶ 7} When Starks' 10-year-old daughter came partially down the stairs of the apartment around 2:00 or 2:30 a.m., on February 13, appellant decided to leave, but he took the gun and the clip with him. Starks locked the door and tried to act as if the incident never happened. Starks stated she did not think appellant would shoot her and she did not think that he would shoot Bostic so she was not worried when he finally left.

{¶ 8} Starks testified she did not hear any arguing between appellant and Bostic through the walls of the adjoining apartment on the morning of February 13, but thought she could hear appellant arguing with himself through the walls on other occasions. Starks testified she next saw appellant at about 8:00 a.m. on February 13, when appellant was yelling on a cell phone outside.

{¶ 9} Starks testified the topic of her being detained did not come up with the police during her initial questioning at the time of appellant's arrest, but she did affirm to police that Bostic was detained by appellant. Starks stated she just did not want to get involved. Starks only told the police her entire story about being detained with a gun the following week.

{¶ 10} Bostic testified that she was the only one home in the early morning of February 13, 2012. When Bostic first opened the door for appellant around 2:30 a.m., she stated he said "I just scared the -- scared the hell out of your neighbor." (Tr. Vol. I, at 142.) When asked why, appellant responded "I just put the gun to her head." (Tr. Vol. I,

at 143.) Bostic testified that appellant fired a warning shot, to see if anybody would come. Starks however never testified to hearing this warning shot which was supposed to have happened fairly soon after appellant arrived at Bostic's apartment after he just left Starks.

{¶ 11} Bostic's testimony is clear that appellant put the gun to her chin, made her pray, repent, and state bible verses while he called her dumb bitch and other names. Bostic was shot in the ankle when she was sitting on the couch with her face covered by her hands. Appellant was standing a little distance away from her with the gun pointed at her when he shot her. Once Bostic was shot, she covered her legs with a blanket because she did not believe appellant was aware that she was injured. For two hours after Bostic was shot and covered with the blanket, appellant was torturing her, hitting her, and making her state bible verses.

{¶ 12} When appellant discovered that Bostic had been shot, he said that he did not mean to shoot her, but continued to ramble and ask bible questions stating "This time you better answer this or else I'm gonna blow your damn head off." (Tr. Vol. I, at 166.) After appellant saw that Bostic was hurt, he let her go to the bathroom and then tried to put a towel around her ankle.

{¶ 13} Bostic was able to get away at one point and went to her child's bedroom, intending to jump out the window. She saw her neighbor TJ going to work. TJ saw her and asked what was wrong. Ms. Bostic either said help me or he shot me. Appellant returned with the gun at that moment and banged on the door demanding to be let in.

{¶ 14} When appellant saw her at the window, he asked her if she was going to jump. Bostic replied that she thought she saw her kids but it was the neighbor TJ. Apparently, at this point, appellant went to the window and said something to TJ after putting the gun down on the child's bed.

{¶ 15} As appellant was having a conversation with TJ, Bostic hid the gun under some blankets on the bed and went downstairs and then outside. TJ let her go to his house and stated he would wait outside for appellant. Once Bostic locked TJ's front door behind her, she called her children's father, Frasier, who was already late in bringing the kids home to Bostic's apartment. Frasier ended up calling the police who arrived within a few minutes. At trial, Bostic denied stating to medical personnel that the shooting was an accident.

{¶ 16} Appellant sent Ms. Bostic letters after the incident.  On February 17, 2012, appellant wrote that the devil took his mind that there were no drugs involved.  He also wrote that he was sorry.

{¶ 17} On March 29, appellant asked Bostic to forgive him and marry him.  He promised to get help.  On March 30, 2012, appellant wrote that he did not mean to shoot Bostic and that he was wrong for his actions.

{¶ 18} As indicated earlier, appellant was indicted on two counts of kidnapping in violation of R.C. 2905.01 and one count of felonious assault in violation of R.C. 2903.11.  On January 29, 2013, a three-day jury trial commenced in which appellant was convicted on all counts.  Appellant timely filed a notice of appeal on February 5, 2013.

### There was No Prosecutorial Misconduct in the Closing Argument

{¶ 19} The first assignment of error argues that the prosecuting attorney's remarks during closing arguments constituted prosecutorial misconduct which deprived appellant of a fair trial.  Upon examination, the prosecuting attorney's closing remarks do not shift the burden of proof to the defendant and do not amount to prosecutorial misconduct.  The comments focus on the lack of evidence supporting the defendant's theory of the case that the gun went off accidentally.

{¶ 20} "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant."  *State v. Smith*, 14 Ohio St.3d 13, 14 (1984).  A prosecutor's conduct cannot be grounds for error unless such conduct deprived the defendant of a fair trial.  *State v. Evans*, 63 Ohio St.3d 231, 240 (1992).  Absent the deprivation of a fair trial, no constitutional error occurs.  *Darden v. Wainwright*, 477 U.S. 168, 183 (1986).  The Supreme Court of Ohio has cautioned that prosecutorial misconduct constitutes reversible error only in rare instances.  *State v. Keenan*, 66 Ohio St.3d 402, 405 (1993).  Additionally, a failure to object requires that we review any error under the stringent plain error standard.  Crim.R. 52(B); *see Evans* at 240.

{¶ 21} We must review a closing argument in its entirety to determine whether prejudicial error exists.  *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶ 94.  A prosecutor's statements are not be taken out of context and given their most damaging meaning.  *Id.*  Further, pursuant to the doctrine of cumulative error, "a conviction will be

reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64 (1995).

{¶ 22} Prosecutors are given considerable latitude in closing argument. *State v. Dillon*, 10th Dist. No. 04AP-1211, 2005-Ohio-4124, ¶ 50. The prosecutor is entitled to comment on "what the evidence has shown and what reasonable inferences may be drawn therefrom." *State v. Butler*, 10th Dist. No. 03AP-800, 2005-Ohio-579, ¶ 11.

{¶ 23} Prosecutorial misconduct exists when the language used by the prosecutor "was *manifestly* intended or was of such character that the jury would naturally and *necessarily* take it to be a comment on the failure of the accused to testify." (Emphasis sic.) *State v. Webb*, 70 Ohio St.3d 325, 328 (1994). The Supreme Court has clearly identified that a prosecution's comments on the defense's failure to provide evidence to support a theory of a case does not necessarily shift the burden of proof or necessarily go to a defendant's refusal to testify:

> It is long-standing precedent that the state may comment upon a defendant's failure to offer evidence in support of its case. Such comments do not imply that the burden of proof has shifted to the defense, nor do they necessarily constitute a penalty on the defendant's exercise of his Fifth Amendment right to remain silent. A prosecutor may jeopardize the integrity of a trial by commenting on a criminal defendant's decision not to testify. Nevertheless, the prosecutor is not precluded from challenging the weight of the evidence offered in support of an exculpatory theory presented by the defense. Neither must the state, in order to satisfy its own burden of proof, disprove every speculative set of possibly exculpatory circumstances a defendant can suggest, nor refrain from arguing the defendant's failure to provide evidence to support proffered theories of excuse or innocence.

(Citations omitted.) *State v. Collins*, 89 Ohio St.3d 524, 527 (2000). A prosecutor is permitted to highlight the lack of evidence supporting a defendant's theory of case.

{¶ 24} Appellant argues that various statements made by the prosecution during closing arguments where comments on appellant's failure to testify or shifted the burden of proof onto appellant. "You're going to hear absolutely no explanation of why he would continue to contact her and want to marry her, because there is none if he didn't do this." (Tr. Vol. II, at 139.) "You're not gonna hear how this accident could have happened if -- why he had the gun in the first place. * * * And you're not going to hear an explanation for the trajectory of the path of the bullet." (Tr. Vol. II, at 140.)

{¶ 25} In the closing rebuttal, the prosecution made similar statements: "You heard no explanation for the trajectory of the bullet other than this tug-of-war which is pure conjecture and does not fit the evidence. And no explanation for how his firearm could be tested in twelve different ways * * * and not go off. No explanation." (Tr. Vol. II, at 216.)

{¶ 26} These statements and similar ones made during the prosecution's closing argument addressed the lack of evidence to support appellant's theory of the case and are not comments on appellant's failure to testify. The prosecution is addressing the jury in a future tense referring to appellant's counsel's explanation of the evidence that would occur in appellant's closing argument or in the past tense during the prosecution's rebuttal. These statements do not amount to prosecutorial misconduct.

{¶ 27} The following statement was also made in the closing rebuttal: "Where are these Facebook posts, these people he was talking to on the phone. Where are they? They are his family. What good is that gonna do? Are they gonna come in and testify against him? Does that make any sense?" (Tr. Vol. II, at 207.) This comment was objected to and sustained. However, the comment does not amount to misconduct.

{¶ 28} Defense counsel, in closing argument, stated that there was no evidence to support Starks' claims that appellant was on Facebook and the phone all day becoming upset and rambling:

> Where is the evidence? Where is all this Facebook rambling stuff? Where's transcripts of all that, or printouts of all this Facebook rambling that Mr. Brown is supposedly doing all day long?
>
> Who are all these people he's talking on the phone to? Where's his phone records? Who's he on the phone

> talking to all day long doing all this rambling?  We
> have no evidence, no evidence whatsoever to back up
> these women's claims or Laurika's claims that he's on
> Facebook all day and rambling and rambling.  Where
> is all that crazy rambling on Facebook?
> We have no proof of that other than Laurika Stark's
> word.

(Tr. Vol. II, at 148.)

{¶ 29} The prosecuting attorney was responding to defense counsel's argument that the State failed to offer some evidence, not that appellant failed to testify.  The prosecution's statements about the State not producing Facebook posts or having appellant's family testify were neither manifestly intended to be a comment on the accused failure to testify, nor would the jury naturally and necessarily take them to be.

{¶ 30} It is improper for a prosecuting attorney to make arguments or remarks likely to inflame the passions of the jurors, if intended to lead them to convict for an improper reason.  *Berger v. United States*, 295 U.S. 78, 88 (1935).

{¶ 31} Appellant argues that these statements were likely to inflame the passions of the jurors: "So he has this history of erratic behavior * * *."  "He's getting upset all about Facebook.  Is that what we would do?  Probably not.  So keep this in mind when you're thinking about all of these people."  (Tr. Vol. II, at 113-14.)

> You are talking about the kind of guy who writes those
> kind of letters, who rambles all the time, who talks to
> himself, argues with himself,  and who gets so worked
> up over a Facebook post that he cries.  There's nothing
> wrong with that, I'm just -- with men crying, I'm just
> saying this is overly emotional.  This is how he reacts.
> Remember, Laurika [Starks] said he has his issues,
> issues.  His behavior became erratic so she had to get
> him to leave.

(Tr. Vol. II, at 143.)

{¶ 32} These comments about appellant's behavior are not intended to inflame the passions of the jurors, but are comments on the evidence given by the two witnesses of, what the prosecution argues, was appellant's irrational behavior.  The prosecutor may comment on what the evidence has shown and what are reasonable inferences from that

evidence. *Butler* at ¶ 11. These are proper comments on the evidence properly before the jury and do not amount to prosecutorial misconduct.

{¶ 33} We find there was no prosecutorial misconduct during the closing arguments or in the closing rebuttal.

{¶ 34} The first assignment of error is overruled.

### There was No Ineffective Assistance of Counsel

{¶ 35} The second assignment of error argues that appellant's trial counsel's failure to object to the prosecutor's improper statements during closing arguments deprived him of his rights to a fair trial. As previously noted, we find that there was no prosecutorial misconduct during the closing argument or rebuttal, therefore defense counsel's conduct did not rise to ineffective assistance of counsel.

{¶ 36} A two-step process is employed when considering allegations of ineffective assistance of counsel. "First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness." *State v. Lytle*, 48 Ohio St.2d 391, 396-97 (1976), *vacated in part on other grounds.*

{¶ 37} A counsel performance "will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley*, 42 Ohio St.3d 136, paragraph two of the syllabus. The question is whether counsel acted "outside the wide range of professionally competent assistance." *Strickland v. Washington*, 466 U.S. 668, 689. Appellate courts must be highly deferential in scrutinizing counsel's performance. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight. * * * There are countless ways to provide effective assistance in any given case." *Id.*

{¶ 38} Appellant claims that his defense counsel was ineffective and deprived him of his constitutional rights by failing to object to all the remarks he claims were improper that were made during the prosecution's closing argument. We have found that there was

no prosecutorial misconduct during the closing argument and therefore cannot find defense counsel was ineffective in failing to object to such remarks.

{¶ 39} The second assignment of error is overruled.

### *Sufficient Evidence was Presented to Overcome a Civ.R. 29 Motion*

{¶ 40} The third assignment of error argues that the trial court erred by overruling appellant's Crim.R. 29 motion for judgment of acquittal. The prosecution, however, presented sufficient evidence going to each element of the case

{¶ 41} When reviewing the sufficiency of the evidence to support a conviction an appellate court must examine the evidence that, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence. *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 42} When there is conflicting evidence, "it [is] the function of the jury to weigh the evidence and assess the credibility of the witnesses in arriving at its verdict. Where reasonable minds can reach different conclusions upon conflicting evidence, determination as to what occurred is a question for the trier of fact. It is not the function of an appellate court to substitute its judgment for that of the factfinder." *Jenks* at 279.

{¶ 43} In the case at bar, the State presented the testimony of the two victims, Laurika Stark and Andrea Bostic, who testified to being held at gunpoint and in Bostic's case, being shot. The State also presented evidence by forensic experts who testified to the trajectory of the bullet; that residue of a gunshot was found on appellant's hand; and that the gun was tested dozens of times and showed that it would not discharge accidentally.

{¶ 44} We find, when viewing the evidence most favorably for the prosecution, that there was sufficient evidence going to each and every element of case from which the jury could reasonably find appellant guilty beyond a reasonable doubt.

{¶ 45} The third assignment of error is overruled.

### *The Jury's Verdict is Not Against the Manifest Weight of the Evidence*

{¶ 46} In the fourth assignment of error, appellant argues that the verdict was against the manifest weight of the evidence. In reviewing the record, we find that the verdict is not against the manifest weight of the evidence and there is competent and credible evidence to support it.

{¶ 47} A manifest weight argument, in contrast to a claim of insufficient evidence, requires us to engage in a limited weighing of the evidence to determine whether there is enough competent and credible evidence so as to permit reasonable minds to find guilt beyond a reasonable doubt and, thereby, to support the judgment of conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Issues of witness credibility and concerning the weight to attach to specific testimony remain primarily within the province of the trier of fact, whose opportunity to make those determinations is superior to that of a reviewing court. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). The question is whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Hancock*, 108 Ohio St. 3d 57, 63, quoting *Martin* at 175. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction. *Thompkins* at 387.

{¶ 48} A jury may "take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Nivens*, 10th Dist. No. 95APA09-1236 (May 28, 1996). "Furthermore, it is within the province of the jury to make the credibility of witnesses. ('It is the province of the jury to determine where the truth probably lies from conflicting statements, not only of different witnesses but by the same witness')." (Citations omitted.) *Dillon* at ¶ 15, quoting *State v. Harris*, 73 Ohio App.3d 57, 63 (10th Dist.1991).

{¶ 49} While there were inconsistencies in the testimony of the two victims in this case, these inconstancies are not great nor do they detract from the other consistent evidence in this case; that appellant was in both victims' homes with a gun, both victims felt terrorized, appellant was clearly angry and emotional, and one victim was shot. Further, the forensic evidence does not indicate that Bostic was shot accidentally. The

evidence does not support appellant's argument that the jury clearly lost its way or even the defense's theory that the gun went off accidentally. After reviewing the entire record with caution and deference to the role of the trier of fact, we find that the verdict is not against the manifest weight of the evidence.

{¶ 50} The fourth assignment of error is overruled.

{¶ 51} Having overruled all the assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT, P.J., and T. BRYANT, J., concur.

T. BRYANT, J., retired, of the Third Appellate District, assigned to active duty under the authority of Ohio Constitution, Article IV, Section 6(C).

_____